# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KEN KOEHLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-CV-10204 |
| | ) | |
| RICOH USA, INC., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

After a human resources investigation revealed that plaintiff Ken Koehler shipped personal items using the company FedEx account, defendant Ricoh USA, Inc. delivered Koehler a termination notice. But Koehler maintains that the results of the investigation were a pretext for the real reason Ricoh wanted to ship him away: his age. Koehler, who was 53 years old at the time, subsequently filed suit alleging that his termination violated the Age Discrimination in Employment Act. Ricoh now moves for summary judgment, arguing that Koehler cannot deliver on his claim.[1]

---

[1] The Court considers the undisputed facts to evaluate Ricoh's motion for summary judgment, and if facts are disputed, the Court considers Koehler's version of events to the extent it is supported by the record. *See McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016) ("Summary judgment is appropriate only if, construing the record in the light most favorable to the party opposing summary judgment, no jury could reasonably find in favor of that party."). But many "facts" cited by Koehler, and many of Koehler's disputes with Ricoh's statement of facts, are based on mischaracterizations of the evidence or are arguments as to the significance of the evidence as opposed to factual challenges. *See, e.g.*, Pl's. Statement of Facts ¶ 23 (disputing Ricoh's description of the number of interviews an investigator conducted and means through which those interviews occurred by stating that "most, if not all, of [the investigator's] activity had nothing to do with" allegations against Koehler, and that the investigator "did not genuinely investigate" the relevant facts); Pl's. Statement of Facts ¶ 99 (indicating that Koehler told his superior that he shipped personal envelopes on the company dime, where the cited portion of the record says only that Koehler told his superior that he was interviewed concerning his use of

# I. BACKGROUND

Ken Koehler worked for Ricoh for over 20 years. By 2014, his title was Operations Manager II ("OM II") and he ran the legal document services production department in Chicago. In that capacity, Koehler supervised over 40 employees, was directly responsible for a substantial budget, and had wide discretion with regard to necessary business expenses.

Ricoh has a computerized expense reimbursement system called Concur. Employees use Concur to seek reimbursement for out of pocket expenditures they make on the company's behalf. Although reimbursement requests submitted through Concur are reviewed and approved by an employee's immediate supervisor, approved reimbursements can be rejected by Ricoh's finance department. As part of their jobs, OM IIs periodically had to provide cash per diems to employees for use on business trips. Although OM II's were required to provide per diems out of pocket, Ricoh would sometimes reject Koehler's (and other OM IIs') efforts to be reimbursed via Concur. It was therefore common practice at Ricoh for employees to employ alternative methods of getting paid back, including mischaracterizing expenses in Concur. Indeed, Koehler's immediate supervisor, Rick Toumbs, told Koehler to "do whatever you have to do" to be reimbursed for out of pocket expenses. Deposition of Ken Koehler ("Koehler Dep.") 51:12-52:21, ECF No. 62-2.

---

company FedEx resources). Koehler also repeatedly disputes evidence by asserting that the proponents of the evidence are not credible. *See, e.g.*, Pl's. Statement of Facts ¶ 30. But a plaintiff "cannot rest on mere unsupported denials[;] he must come forward with contradictory evidence of his own to establish a genuine issue of material fact." *Hannon v. Turnage*, 892 F.2d 653, 657 (7th Cir. 1990).

Moreover, the parties spill a lot of ink arguing about the admissibility of various pieces of evidence. The Court need not resolve those disputes, however, because it concludes that even if it resolved them in Koehler's favor, Koehler still has not adduced evidence sufficient to survive summary judgment.

In April 2014, one of the employees Koehler supervised, David Goldie, reported a number of violations of Ricoh company policy to human resources. Among other things, Goldie told HR that Koehler shipped a personal envelope using Ricoh's FedEx account and that an employee named Jose Chavarro had hours added to his time sheet that he did not actually work. According to Goldie, several of Chavarro's supervisors approved of the added hours. Ricoh designated Roy Williamson to investigate Goldie's allegations.

At the time of the investigation, Williamson had been an HR investigator for two years. Williamson and Toumbs discussed the investigation; HR investigators typically kept Toumbs generally abreast of investigations of his employees as they proceeded. The investigation was extensive; Williamson interviewed 13 people (some multiple times), reviewed eight types of records and documents, and ultimately drafted a report assessing the veracity of each of Goldie's allegations. In May 2014, Williamson interviewed Koehler about Goldie's accusations. Koehler admitted to Williamson (and does not dispute now) that he used Ricoh's FedEx account to make personal shipments on 5 or 6 occasions over a period of several years. Koehler told Williamson that he only did so because Ricoh would not reimburse him for certain out of pocket business expenses via Concur. Williamson subsequently found documentation indicating that Koehler had used Ricoh's FedEx account to send an envelope to his son. After the interview, Koehler called Toumbs, who recalls only that he was made aware of the existence of an investigation into Koehler's use of the company FedEx account. Deposition of Rick Toumbs ("Toumbs Dep.") 97:22-98:18, ECF No. 62-3. Toumbs did not independently investigate misuse of the FedEx account, nor did he take action against Koehler until Williamson's investigation into all of Goldie's allegations concluded. While Williamson's investigation was ongoing, Toumbs gave

Koehler an overwhelmingly positive performance review and Koehler received a raise in his yearly salary.

Also in May 2014, Williamson interviewed Chavarro, who told Williamson that several of his superiors (which did not include Koehler) had added 5 to 10 hours per week that he had not worked to his time sheets. Chavarro's superiors denied that time Chavarro did not work had been added to his time sheets. Williamson discovered that 185 hours had indeed been manually added to Chavarro's time cards, but badge swipes and cell phone records revealed that Chavarro actually worked at least 95.5 of those hours. Williamson was not able to conclude whether or not Chavarro worked the remaining 89.5 hours. Records show, however, that time was added to Chavarro's time sheets on days when Ricoh was closed, and at other times that suggested that Chavarro did not actually work all of the hours on his time sheets (*e.g.*, on one day, 12.25 hours were added to Chavarro's time sheets by one of his superiors at 1:55 p.m., when Ricoh had only been only been open for a few hours). At the time of the investigation, Chavarro reported to Koehler, although Chavarro was employed in the "sales" branch of Ricoh, while Koehler was employed in the "operations" branch of Ricoh.

Williamson's investigation ended in July 2014. Williamson recommended that Koehler be terminated, he averred, in order to comport with the way Ricoh treated other employees who had violated its Code of Ethics by committing theft. Ricoh's Code of Ethics specifically provided:

> Employees must protect Company assets and resources. Illegal or improper use of such assets and resources is prohibited. . . . As a Company employee, you have access to many Company assets and resources including . . . mail resources. You are expected to use all Company assets and resources solely for Company business purposes unless you obtain authorization in advance from your manager and provide appropriate reimbursement to the Company for any approved non-business use.

Pl's Statement of Facts ¶ 6, ECF No. 62. Williamson's report on the investigation indicated that if Koehler was not terminated for theft, he should be issued a "Letter of Concern" reprimanding him for misusing company resources. Williamson Report D0487, ECF No. 65-6. After receiving Williamson's recommendation, Toumbs and his superior, John Hart, agreed that Koehler should be terminated for his Code of Ethics violation. On July 21, 2014, Koehler was called into a meeting with Toumbs and HR employee Sara Marrero. Toumbs and Marrero informed Koehler that he was being terminated for his personal use of the FedEx account. Toumbs was in tears at the meeting, and Marrero told Koehler that "senior leadership" disagreed with the decision to fire him. Koehler Dep. 65:3-18. Marrero's notes regarding Koehler's termination included Koehler's age, 53. She told Koehler that, due to his age and tenure with the company, he would be provided with severance benefits notwithstanding his for cause termination. Koehler was ultimately replaced with a 38 year-old employee who Toumbs had praised in a performance evaluation, some two-and-a-half years earlier, for her "energy and pace." Maribel Gonzalez Appraisal Review D1209, ECF No. 65-15.

Koehler subsequently filed suit against Ricoh, alleging that he was fired due to his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. Discovery ensued, and Ricoh now moves for summary judgment.

## II.    DISCUSSION

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623. These protections are afforded only to employees who are at least 40 years of age, and age must be the "but-for" cause of the challenged action. 29 U.S.C. § 631(a); *Carson v. Lake Cty.*,

865 F.3d 526, 532 (7th Cir. 2017). "[I]n the ADEA context, it's not enough to show that age was a motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018).

One way of analyzing whether the plaintiff has met that burden is the burden-shifting framework described by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff must come forward with evidence showing that (1) he is a member of a protected class, (2) he was meeting the defendant's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Carson*, 865 F.3d at 533. If the plaintiff establishes a prima facie case, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id*. The *McDonnell Douglas* framework is not, however, the exclusive method of using circumstantial evidence to prove discrimination; rather, "at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of [his] age." *Id*. In evaluating the evidence, the Court will "make only reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am.*, LLC, 759 F.3d 724, 730 (7th Cir. 2014).

### A.     *McDonnell Douglas*

First, the Court will evaluate the record under the *McDonnell Douglas* framework because the parties couch their positions in its terms. Ricoh contends that Koehler's personal use of Ricoh's FedEx account prevents Koehler from making out a prima facie case, as it demonstrates that Koehler was not meeting Ricoh's legitimate expectations—in this case,

6

Ricoh's expectation that its employees follow its Code of Ethics. The Court agrees with Koehler, however, that this is not a useful inquiry at this stage of the analysis. One of Koehler's principal arguments is that even if he technically violated the Code of Ethics, he was punished more harshly than younger comparators. "[W]here the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it makes little sense to discuss whether she was meeting her employer's reasonable expectations." *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001). Although Koehler maintains that he was meeting his employer's legitimate expectations, he argues in the alternative that multiple employees failed to meet Ricoh's legitimate expectations in the same way he purportedly did, but only he was terminated. In these circumstances, Koehler need not show that he was meeting his employer's legitimate expectations to make a prima facie case of discrimination.

Koehler's prima facie case nonetheless collapses at the fourth prong because Koehler has not identified a similarly situated comparator. On this issue, Koehler puts his eggs in one basket, focusing extensively on Chavarro's discipline (or lack thereof). In Koehler's view, Chavarro was knowingly paid for at least 89.5 hours of time that he did not work—at a cost to Ricoh substantially higher than Koehler's FedEx shipments—and was only given a "Letter of Concern," while Koehler was terminated. On its face, there are similarities between Koehler and Chavarro: they were both subjects of Williamson's investigation, and both purportedly committed a deception that resulted in losses to the company.

Koehler falls short in his burden to show that Chavarro and Koehler were similarly situated, however, because to be similarly situated, the disciplinary action to which they were subject must have been meted out by the same decision maker. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) ("[T]his court generally requires a plaintiff to demonstrate at a

minimum that a comparator was treated more favorably by the same decision-maker who fired the plaintiff."). Koehler points to his own affidavit, in which he attests that at the time both Chavarro and Koehler were disciplined, Chavarro reported to Koehler, who in turn reported to Toumbs and Hart, the individuals who terminated Koehler. But aside from this description of the chain of command, Koehler has presented no evidence whatsoever concerning who determined that Chavarro would be retained. By contrast, Toumbs's deposition testimony indicates that Toumbs did not even know that Chavarro was part of Williamson's investigation; he only learned of Chavarro's alleged misconduct at the deposition. Toumbs Dep. 127:1-128:20. And the record contains no evidence indicating that Hart—three rungs up the chain from Chavarro—had anything to do with Chavarro's retention. At his deposition, Hart testified that he was generally aware of claims that workers with Chavarro's title were obtaining payment for time they did not work, but he could not recall hearing of any evidence to substantiate those claims. Deposition of John Hart ("Hart Dep.") 128:4-130:13, ECF No. 62-4. Plaintiff's counsel never asked Hart if he was involved in disciplinary decisions with regard to those employees. The transcript does, however, indicate that plaintiff's counsel asked Hart if he was familiar with a "Jose Tavares," who "admitted to adding time to his time card for work he did not perform." *Id*. It is unclear if this is a transcription error and counsel actually asked about Chavarro; nonetheless, Hart's answer was that he was unfamiliar with the individual.[2] *Id*. In any event, the record contains no

---

[2] It also bears noting that even if Toumbs and Hart had been involved in the decision about what disciplinary action to take as to Chavarro, the investigative findings differed significantly as to Chavarro and Koehler. Williamson's investigation reflected that the evidence relating to the payments Chavarro received was at least in part inaccurate and otherwise was inconclusive. By contrast, Williamson's investigation (aided by Koehler's admissions) confirmed that Koehler had violated the company's Ethics policy. Further, the payments Chavarro received were approved and facilitated by his supervisors; although Koehler maintains that Toumbs told him to "do whatever you have to do" to get reimbursed, he conceded in his deposition that he did not obtain any authorization or approval from anyone in management to

evidence to support—and, in fact, substantially refutes—the notion that Koehler and Chavarro were disciplined by the same decision makers. Without any such evidence, Koehler cannot make out a prima facie case.

### B. Other Evidence of Discrimination

Even outside the *McDonnell Douglas* framework, Koehler has not presented evidence sufficient for a reasonable jury to conclude that he was terminated because of his age. Koehler first cites evidence that he says establishes that Toumbs did not actually believe Koehler violated any company policies when he decided to fire Koehler. Koehler points to his deposition testimony indicating that Toumbs told him to "do whatever you need to do" to be reimbursed for out of pocket expenses. According to Koehler, this statement meant that Toumbs had given him permission to use the corporate FedEx account for personal shipments. But this is not an even arguably reasonable view of the evidence. It cannot be inferred that when Toumbs told Koehler to "do whatever [he] needed to do" to be reimbursed, he meant it literally; no one would reasonably understand Toumbs' comment to mean that Koehler could, say, forcibly rob Ricoh's CEO at gunpoint or hack into Ricoh's bank accounts and siphon funds with impunity. There is a limited universe of permissible courses of action that Toumbs had in mind when he told Koehler to "do whatever [he] needed to do." Koehler has not adduced any evidence, aside from the broad statement itself, to permit a reasonable inference that Toumbs specifically permitted Koehler use the company FedEx account for personal shipments. The only relevant evidence Koehler cites is the testimony of one employee that there was a general attitude that "you need to get your money back so [you] do what you need to do." Deposition of Keith Sanders 18:15-20, ECF No. 62-24. But this statement referred to the practice of employees misrepresenting the reason for

---

send personal packages on the company's FedEx account. Koehler Dep. 76:17-22. Chavarro and Koehler were not similarly situated in this regard, either.

reimbursement within the Concur expense system. *Id*. And that suggestion comports with Toumbs' testimony about the meaning of his statement to Koehler—Toumbs testified that he meant that Koehler should have done whatever he needed to do to be reimbursed "[t]hrough the expense reporting system." Toumbs Dep. 89:18-90:15. The record therefore belies Koehler's suggestion that Toumbs did not believe that Koehler violated company policy.[3]

Next, Koehler cites evidence that he says permits a finding that Toumbs and Hart did not genuinely believe he deserved to be fired, even if they believed he violated Ricoh's Code of Ethics. Most of this has to do with things that did (or did not) happen to Koehler in between the time when Williamson interviewed Koehler, in May 2014, and when Williamson completed his report and sent it to Toumbs in July 2014. In Koehler's view, that he was not immediately fired after his interview or suspended pending completion of Williamson's report, and that he was given a glowing performance review and a raise before Williamson's report was completed, suggests that Toumbs and Hart did not believe that Koehler should be fired over his personal use of company resources (and therefore the violation was a pretext for age discrimination). As an initial matter, this argument makes little sense. That the company praised him and gave him a raise even while an investigation was pending, and fired Koehler only when the investigation was completed and had confirmed that he had stolen from the company, ***supports*** an inference that the violations, not Koehler's age, were the cause of the termination.

More significantly, and contrary to Koehler's repeated suggestions (which border on misrepresentations of the record), the record contains no evidence that Toumbs or Hart knew the

---

[3] Koehler also points to evidence that other Ricoh employees actually shipped the FedEx materials on Koehler's behalf, and that FedEx shipments were audited after the fact. While Koehler tries to characterize this as evidence that "Ricoh" knew about or tacitly approved of his conduct, the record contains no evidence that Toumbs and Hart—the decision makers who terminated Koehler—had any knowledge of Koehler's FedEx shipments before Williamson's investigation.

details of Williamson's interview with Koehler until the completion of Williamson's report. Koehler cites to Toumbs' deposition testimony, which he claims provides that Toumbs and Koehler discussed "the fact that Koehler was reimbursed for business expenses he was required to pay with cash from his pocket by having an envelope sent on Ricoh's Fed Ex account." Pl's. Statement of Facts ¶ 99. But the cited portion of Toumbs' deposition indicates: "Ken had contacted me after I spoke with Roy to say, hey I know that, you know, there is an investigation going on surrounding sales and Oscar Vega, however, I was interviewed regarding the use of the FedEx machine or something to that effect." Toumbs Dep. 98:2-18. When asked what else Koehler told him on the phone call, Toumbs responded: "That's all I recall. I just remember he had brought it up." *Id*. And despite Koehler submitting both his own deposition testimony (during which Koehler's counsel had the opportunity to examine him) and a declaration, the record contains no account of the call from Koehler. The record indicates only that Koehler told Toumbs in May 2014 that he was interviewed concerning his use of the FedEx machine; it does not support Koehler's assertion that he confessed his misuse of the FedEx account to Toumbs. So, that Toumbs and Hart did not fire Koehler until two months after his interview is not helpful for Koehler—it suggests only that Toumbs and Hart fired Koehler when they learned of his misconduct via Williamson.

Koehler next maintains that Toumbs' purported reliance on Williamson's recommendation to terminate him is a sham because Williamson did not actually recommend terminating him. That claim, too, is wrong. In his declaration, Williamson described the call in which he reported the results of his investigation to Toumbs and Jackson and stated expressly that "because Mr. Koehler had thus violated Ricoh's Code of Ethics, I recommended termination of his employment, explaining that would be consistent with how Ricoh had disciplined other

employees who had committed violations of the Code of Ethics that involved theft." Declaration of Roy Williamson ¶ 23, ECF No. 51-7.[4] In support of his assertion, Koehler refers to Williamson's report, which he says recommended only a Letter of Concern for Koehler, and not termination. But that's not an accurate characterization. The report is consistent with Williamson's declaration indicating he recommended Koehler be fired, providing: "***Assuming [Koehler] is not terminated for theft*** it needs to be part of a letter of concern that he needs to connect with purchasing to look at all his options on making company purchases." Williamson Report D0487. Williamson's report therefore explicitly contemplated the possibility that Koehler would be fired for theft.[5] Koehler cannot create an issue of material fact by decontextualizing the record. *Skiba*, 884 F.3d at 720 (statements made in an ADEA case must be considered in context).

Koehler also points to the circumstances of the meeting in which he was terminated as evidence that Toumbs and Hart did not believe he should be fired for misusing the FedEx account. In that meeting, Marrero privately told Koehler that "senior leadership" disagreed with the decision to fire him, Marrero's notes indicated that it was a "difficult decision" to fire him, and Toumbs was in tears. Even if it were possible to identify the "senior leadership" to whom Marrero referred (and Koehler did not develop an evidentiary basis to do so), it is unclear how this evidence permits an inference that Toumbs and Hart fired Koehler because of his age, as opposed to his Code of Ethics breach. If anything, this evidence militates against the conclusion that Toumbs' and Hart's putative reason for firing Koehler was pretextual—it suggests that the

---

[4] Williamson also testified in his deposition that he recommended Koehler's termination. Deposition of Roy Williamson 90:18-20, ECF No. 62-6.

[5] Koehler's statement of facts in his brief omits any reference to Williamson's recommendation to fire Koehler, stating only that the report "included" items for a Letter of Concern.

decision to fire Koehler was a close call, which would not have been the case had Ricoh been searching for any (made up) reason to oust an older employee.[6] In any event, even if this evidence permitted the inference that Koehler was fired for some unstated reason, it sheds no light on what that unstated reason was. And in the absence of the presumption of discrimination afforded by a *McDonnell Douglas* prima facie case, Koehler's burden is not to prove that the stated reason for his termination was a fiction—he must show that a reasonable jury could conclude that the actual reason was his age. *Ortiz*, 834 F.3d at 765.

On that front, Koehler points to several pieces of evidence that he argues permit an inference that he was fired due to his age. Most of this evidence concerns events that occurred around the time Koehler was fired. Marrero's notes regarding Koehler's termination included Koehler's age, 53, and Marrero arranged for Koehler to get outplacement severance benefits, which is unusual for an employee terminated for cause. The reference to Koehler's age, however, was included with other data relevant to the outplacement assistance that was going to be provided, and Marrero told Koehler that he was receiving those benefits because of his tenure and her belief that Koehler might need help regaining his footing. But Marrero's notes and comments are not particularly probative, as the record permits no inference but that the decision to terminate Koehler had already been made when Marrero's notes were taken and Marrero did not possess final decision-making authority with regard to Koehler. "Normally, statements by a nondecisionmaker do not satisfy a plaintiff's burden of proof in an employment discrimination case." *Skiba*, 884 F.3d at 722 (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th

---

[6] In advancing these arguments, Koehler is plainly grasping at straws. Contending that the decision to fire him "would not have been difficult" if Ricoh really believed that he had committed theft, Resp., ECF No. 63, at 10, approaches a concession that Koehler's age was not the "but for" cause of his termination because it seemingly acknowledges that Koehler would have been fired for theft regardless of his age.

Cir. 2000)). And beyond that, a mere recognition that an employee is older does not support an attribution of discriminatory animus, especially when that individual seeks to assist the employee in finding other job opportunities. *See id*.

Finally, Koehler posits that the fact that he was replaced by an employee 15 years younger, who Toumbs appreciated for her "energy and pace," suggests age discrimination.[7] Not so. The fact that an older employee was replaced by a younger one cannot, on its own, support a finding of age discrimination under the ADEA. *See Zayas v. Rockford Memorial Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014).[8] And absent an explicit reference to age, the use of purportedly euphemistic terms like "energy" and "pace" to describe employees does not permit an inference of age discrimination. *See Skiba*, 884 F.3d at 721 (holding that a description of plaintiff as "low energy" does not "indicate[] the manager's evaluation derived from plaintiff's age."). That is particularly so when the context of the description was a performance evaluation provided years earlier. Once again, Koehler omits critical detail in his effort to demonstrate discriminatory intent.

In short, to arrive at the conclusion that Ricoh discriminated against Koehler on account of his age, a factfinder would have to rely on "inferences that are supported only by speculation or conjecture." *Id*. at *7. As such, "plaintiff's proffered theory is too divorced from the factual record to create a genuine issue of material fact." *Id*. There is not a scintilla of evidence that

---

[7] Koehler also points to an alleged "plan" that Toumbs and Hart had to replace Koehler with Maribel Gonzalez, the younger employee. But the email in which Hart discusses the "plan" to promote Gonzalez was written two months after Koehler had been terminated, and concerned the logistics of moving Gonzalez from Dallas to Chicago. Hart 9/10/14 E-Mail, ECF No. 65-12. This is yet another example of the mischaracterization by omission of necessary factual context that plagues Koehler's brief and flirts with the boundaries of zealous advocacy.

[8] Nor is it probative that Ricoh replaced another OM II, John Eberhart, with a younger employee, *see* Deposition of John Eberhart 57:22-65:25, ECF No. 62-23, in the absence of evidence that Toumbs or Hart were the relevant decision makers or that the decision was made due to Eberhart's age.

Ricoh was concerned about Koehler's age before he admitted that he had engaged in self-help theft from the company; when the company investigated and confirmed Koehler's misconduct, it fired him. While reasonable minds may differ about whether Ricoh overreacted, particularly in light of Koehler's explanation for his actions and years of excellent service, that is not the sort of dispute that can save Koehler from summary judgment. Only a material fact dispute can do that, and on this record there is none. The evidence does not support a finding that Ricoh's articulated reason for terminating Koehler was a pretext for age discrimination. Because a reasonable factfinder, taking all the evidence together, could not conclude that Ricoh terminated Koehler because of his age, Ricoh's motion for summary judgment is granted.

Dated: March 29, 2018

John J. Tharp, Jr.
United States District Judge